MONIQUE C. WINKLER (Cal. Bar No. 213031)
  winklerm@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
  leejh@sec.gov
RAHUL KOLHATKAR (Cal. Bar No. 261781)
  kolhatkarr@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
  katzma@sec.gov
DREW LIMING (Cal. Bar No. 305156)
  limingd@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| JAKE SOBERAL, and IRMA OLGUIN, JR., | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

**SUMMARY OF THE ACTION**

1. In 2022, Defendants Jake Soberal and Irma Olguin, Jr. (together, "Defendants") falsified documents and misled investors while raising approximately $70 million. Defendants were the co-founders and co-CEOs of Fresno-based Bitwise Industries, Inc. and its corporate

parent, BW Industries, Inc. (together, "Bitwise"). Bitwise offered technology training, software development, and real estate management services.

2. In connection with Bitwise's Series B-2 securities offering in 2022, Defendants made false and misleading statements to investors, including inflating the company's key financial metrics. To substantiate their false claims, Defendants also provided several investors with fabricated documents, including altered bank statements and a falsified audit report. Approximately 20 investors, including individuals, institutional investors, and venture funds, participated in Bitwise's Series B-2 offering.

3. Defendants represented to investors that Bitwise had significant revenue and maintained healthy cash balances. But the strong financial picture Defendants painted was, in fact, a sham. Soberal and Olguin knew that Bitwise had generated far less revenue than what they told investors. In addition, Soberal and Olguin told investors that Bitwise had substantial cash balances while concealing that the company regularly lacked cash and struggled to pay employees and other operational expenses. Defendants also lied to investors about an audit of Bitwise's financial statements by an outside auditor and even provided an investor with a falsified document related to the audit.

4. Defendants' scheme unraveled in late May 2023, when Bitwise ran out of cash and could not pay its employees. Defendants then informed the company's Board of Directors (the "Board")—which included representatives of several large investors—of Bitwise's true financial condition. The next day, all of Bitwise's approximately 900-person workforce was indefinitely furloughed. Several days later, the Board terminated Defendants as co-CEOs.

5. On June 28, 2023, the Board filed a petition for Chapter 7 bankruptcy in the United States District Court for the District of Delaware on behalf of Bitwise Industries, BW Industries, and several related entities. These entities are all currently in liquidation proceedings.

6. As a result of the conduct alleged in this Complaint, Defendants violated the antifraud provisions of the federal securities laws. Specifically, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule

10b-5 thereunder [17 C.F.R. § 240.10b-5], as well as Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

7. In this action, the Commission seeks permanent injunctions, disgorgement of ill-gotten gains with prejudgment interest, and civil monetary penalties. The Commission also seeks an order (1) restraining and enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any securities, provided however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts; and (2) imposing officer and director bars.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. Defendants, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

11. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District. Defendants met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

12. Intradistrict assignment to the Fresno Division is proper pursuant to Rule 120(d) of the Court's Local Rules because a substantial part of the acts and transactions constituting the violations alleged in this Complaint occurred in Fresno County, and Defendants reside in Fresno County.

**DEFENDANTS**

13. **Jake Soberal**, age 37, is a resident of Fresno, California. Soberal co-founded Bitwise and was its co-Chief Executive Officer until June 2023. Soberal was admitted to the California State Bar in November 2011.

14. **Irma Olguin, Jr.**, age 42, is a resident of Caruthers, California. Olguin co-founded Bitwise and was its co-Chief Executive Officer until June 2023.

**RELATED ENTITIES**

15. **BW Industries, Inc.** ("BWI") is a Delaware corporation with its principal place of business in Fresno, California. It is the parent entity of Bitwise Industries. BWI and its securities are not registered with the Commission in any capacity. On June 28, 2023, BWI's Board of Directors filed a petition for bankruptcy on behalf of BWI, Bitwise Industries, and several other BWI subsidiaries. These entities are currently in liquidation.

16. **Bitwise Industries, Inc.** is a California corporation with its principal place of business in Fresno, California. It is a wholly-owned subsidiary and was the operating entity of BWI. Bitwise Industries and its securities are not registered with the Commission in any capacity.

**FACTUAL ALLEGATIONS**

**I.    Bitwise and its Business**

17. Soberal and Olguin co-founded Bitwise in 2013. Prior to co-founding Bitwise, Soberal worked as an intellectual property lawyer and Olguin founded several other start-ups.

18. Bitwise had three core businesses: (1) a "Workforce" business focused on providing apprenticeship training for technology jobs; (2) an "Enterprise Solutions" business providing project-based systems implementation and software development; and (3) a "Community" business focused on developing and managing a commercial real estate portfolio. Its stated mission was to revitalize what it called "underdog cities" by supporting their development of technology industries.

19. Soberal and Olguin founded and headquartered Bitwise in Fresno. Before its collapse in 2023, Bitwise announced that it had expanded to other cities around the United States, including Bakersfield, Merced, Toledo, Buffalo, and El Paso.

20. As co-CEOs, Defendants operated Bitwise together, and employees saw them as joint decisionmakers. In general, Soberal managed Bitwise's real estate portfolio, while Olguin oversaw the technology consulting business. Both Soberal and Olguin were involved in Bitwise's fundraising efforts. They both communicated with potential investors through phone calls, text messages, emails, video conferences, and in-person meetings. Defendants jointly discussed and agreed upon any significant decisions involving Bitwise's fundraising.

**II.    Defendants Raised Approximately $70 Million in 2022**

21. In 2022, Defendants knew that Bitwise needed additional funding to pay operating expenses. They decided to conduct a "Series B-2" offering that consisted of a mix of existing and new investors. Between June and December 2022 (the "Series B-2 Period"), Bitwise raised approximately $70 million from institutional, venture, and individual investors in its Series B-2 round. Some of the investors were social impact funds, which invest in companies that can both provide a positive financial return to the investor and benefit society or the environment.

22. The Series B-2 investors invested in Bitwise in large part because Soberal and Olguin represented to them that Bitwise had a growing business, including significant revenue growth, gross margins over 40%, and large cash balances. Many of the investors were also interested in Bitwise's purported ability to grow a profitable business while generating economic development in underserved communities.

**III.   Defendants Solicited Investors Through False and Misleading Statements**

23. While raising money during the Series B-2 Period, Defendants made numerous false and misleading statements and provided falsified documents to investors because they knew the underlying facts would have revealed Bitwise's poor financial condition.

### A. Defendants Misrepresented Bitwise's Revenue and Gross Margins

24. In connection with the Series B-2 offering, Defendants prepared and provided investors with financial statements that stated that Bitwise had realized significant, consistent revenue growth. According to these financial statements, Bitwise had $59 million in annual revenue in 2021 and had increased its revenue in each successive quarter in 2021—from $8.4 million in the first quarter to $21.6 million in the fourth quarter.

25. The Stock Purchase Agreement for the Series B-2 offering, which was signed by Olguin on behalf of the company, represented that the financial statements provided to investors had been "prepared in accordance with generally accepted accounting principles ('GAAP') applied on a consistent basis[.]" It also represented that Bitwise "maintains a standard system of accounting established and administered in accordance with GAAP." GAAP is important to investors because it provides rules for consistent accounting that allow investors to compare companies' financials, including their revenue, with one another.

26. Despite the representations to investors, Defendants knew, or were reckless in not knowing, that the financial statements they provided to investors were not prepared in accordance with GAAP. For example, shortly before the Series B-2 Period, employees in Bitwise's finance department explained GAAP reporting to Defendants and informed them that the revenue numbers Defendants had been reporting externally were not compliant with GAAP. In addition, Defendants knew that in April 2022, Bitwise's outside auditor had significantly reduced the company's prior revenue numbers because the revenue that had previously been reported by Defendants was not compliant with GAAP.

27. In spite of these warnings, Defendants continued to prepare and provide investors with non-GAAP revenue numbers throughout the Series B-2 Period. Defendants prepared Bitwise's externally-reported financials themselves rather than rely on the company's finance department. Defendants excluded Bitwise's finance department from the financial reporting process because that gave them an opportunity to diverge from GAAP standards and inflate Bitwise's revenue.

28. Defendants' non-GAAP revenue numbers were higher than if they had been prepared using GAAP, because Defendants included financial line items that were impermissible under GAAP. For example, under GAAP's accrual accounting rule, revenue for long term deals with customers is recognized only for the periods in which it is actually earned rather than all upfront. By contrast, Defendants counted the full value of deals as upfront revenue because that allowed them to inflate the revenue numbers. In addition, Defendants sometimes included proposed deals that lacked signed contracts as revenue, which is impermissible under GAAP's rules. If Bitwise's revenue had been prepared in accordance with GAAP, its 2021 annual revenue was less than $59 million and its 2021 quarterly revenue did not grow from $8.4 million to $21.6 million.

29. Defendants also provided investors with financial statements that falsely stated that Bitwise had gross margins of approximately 47% in 2021. Gross margins compare a company's profits and costs to its revenue. Positive gross margins mean that a company generates profit with each dollar earned, while negative gross margins mean that a company loses money with each dollar earned. A gross margin of 47% meant that for every dollar Bitwise received as revenue, it generated 47 cents of profit and the remaining 53 cents were the cost of generating that dollar of revenue. Bitwise's purported 47% gross margin misled investors into believing that its revenue exceeded its production costs and that it had a growing, financially stable business.

30. Because Defendants had inflated Bitwise's revenue by including financial line items that were impermissible under GAAP, Bitwise's gross margins were consequently also inflated. Rather than having gross margins of approximately 47%, Bitwise had negative gross margins in 2021. In other words, instead of turning a profit, Bitwise was losing money and could continue operating only by relying on additional investor or other outside capital.

31. Defendants' misrepresentations regarding Bitwise's revenue and gross margins were important to investors because they falsely painted the picture of a rapidly growing, financially sustainable company, which increased the likelihood that investors would obtain a favorable return on their investments.

**B.     Defendants Misrepresented Bitwise's Cash Balances**

32.     Throughout the Series B-2 Period, Defendants also made false and misleading statements to investors about Bitwise's available cash. They regularly inflated Bitwise's cash balances, which made it appear as if Bitwise had far more cash on hand than it actually did. For example, in connection with the Series B-2 offering, Defendants prepared and provided investors with financial statements that stated that Bitwise's quarterly cash balances dating back to the first quarter of 2020 purportedly never fell below $9.4 million. These financial statements also represented that Bitwise had $29.4 million in cash as of the end of March 2022. And in a November 2022 presentation to the Board, Defendants represented that Bitwise then had over $67 million in cash. All of these reported cash balances were false.

33.     Defendants knew, or were reckless in not knowing, that the information about Bitwise's cash balances they provided to investors was false and misleading because, before and throughout the Series B-2 Period, Bitwise faced repeated cash shortages and was unable to pay its regular operating expenses until it received additional funding. Following Bitwise's collapse in May 2023, Defendants admitted to the Board that the cash balances they had provided to investors were misleading because Defendants had combined both cash and illiquid real estate and represented them collectively as "cash" in order to inflate the company's cash balances.

34.     Defendants also faked documents to misrepresent Bitwise's available cash to investors. For example, in June 2022, Olguin sent to an investor preparing a diligence memorandum for the Series B-2 offering a screenshot of a purported Bitwise checking account statement that showed a balance of $42.6 million as of December 31, 2021, and $23.4 million as of March 31, 2022. This screenshot was falsified. The relevant checking account had a balance of $11.7 million as of December 31, 2021, and only $325,100 as of March 31, 2022. Before Olguin sent the faked screenshot to the investor, Defendants discussed creating it and altering the underlying financial information, then jointly agreed to do so.

35.     Because Bitwise's revenue was far lower than Defendants represented, the company was unable to generate sufficient money to pay employees and other basic operating expenses. Despite their representations to investors about Bitwise's cash balances, Defendants

were aware of the company's lack of cash because they both had access to Bitwise's bank accounts and actively managed Bitwise's payments. For example, throughout the Series B-2 Period, Defendants regularly instructed lower-level employees to issue paper payroll checks instead of direct deposits, short-pay credit cards, and withhold payment to vendors while they sought additional sources of money.

36. In summer 2022, Defendants took out a number of loans—including high-interest loans—to keep Bitwise financially afloat while they continued to solicit investor funds. Defendants did not disclose these loans to the Board or investors. These undisclosed loans meant that investor funds were used to repay loans and their accompanying fees rather than to operate and grow Bitwise, as Defendants had represented to investors.

37. Defendants also personally profited from Bitwise's cash struggles. They repeatedly made personal short-term loans to Bitwise that they signed on behalf of Bitwise as both borrower and guarantor. Defendants paid themselves a significant fee for these loans, which were for periods as short as a single day. For example, on April 4, 2023, Olguin loaned Bitwise $220,000. The following day, Bitwise wired her $247,000, thus providing her with proceeds of $27,000 for a one-day loan.

38. The existence of these self-dealing loans was not disclosed to investors, and Defendants used money Bitwise raised in the Series B-2 offering to repay their loans and pay themselves the accompanying fees. For example, in September 2022, Soberal instructed an employee in the finance department to pay off his and Olguin's loans when Bitwise received $5 million from an investor.

39. Defendants' misrepresentations regarding Bitwise's cash balances were significant to investors because they presented the company as financially healthy when it was struggling to pay bills, incurring increasing loan debt, and in financial distress.

  C.  **Defendants Misrepresented Bitwise's Audited Financial Statements**

40. Prior to 2020, Bitwise did not have audited financial statements. In October 2020, Bitwise hired an outside auditor to audit its financial statements for its 2020 fiscal year.

41. The auditor issued its opinion in April 2022. The audited financial statements differed significantly from the financial statements Defendants had previously presented externally because the auditor could not find support for many of the assets or revenue Defendants claimed existed. For example, the audited financial statements reduced Bitwise's total assets from $87 million to $42 million, reduced its revenue from $31 million to $9 million, and increased its net loss from $7 million to $26 million.

42. During the Series B-2 Period, investors asked Defendants for Bitwise's audited financial statements. Given the disparity between the audited financial statements and the financial statements Defendants had previously provided these investors, Defendants sought to withhold the audited financial statements from those who requested them. In July 2022—four months after the audit was complete and had been provided to Bitwise—Soberal and Olguin each falsely stated in response to direct questions from investors that the audit of the 2020 financial statements was still underway and that they could not provide audited financial statements at the time.

43. Defendants knew, or were reckless in not knowing, that the information they told investors regarding the audited financial statements was false and misleading. Their misrepresentations regarding the availability of Bitwise's audited financial statements were important to investors because the audited financial statements would have revealed Bitwise's true financial condition and made investors less likely to participate in the Series B-2 offering.

44. Defendants also created a fake audited financial statement. In September 2022, one investor who had planned to make a $10 million investment reduced the size of its investment to $5 million based in part on the lack of audited financial statements. In December 2022, Soberal and the investor discussed the possibility of it investing the additional $5 million it had earlier withheld. To solicit the additional $5 million from the investor, Soberal and Olguin jointly agreed to falsify the audited financial statements to significantly improve the appearance of Bitwise's financial condition. Soberal then falsely told the investor that the audit had recently been completed and attached a document that he represented was the audited financial statements.

45. The document Soberal sent to the investor was fraudulent. Defendants dated the document December 1, 2022, while the real audited financial statements were dated April 7, 2022. Defendants included financial statement line items in this fraudulent document that differed significantly from those in the real audited financial statements. Defendants inflated Bitwise's total assets and revenue, while understating its net loss. Shortly after receiving the fake audited financial statements from Soberal, the investor made an additional $5 million investment in Bitwise's Series B-2 offering.

**IV.   Soberal and Olguin's Scheme Fell Apart When They Were Unable to Continue Raising Money**

46. Despite Bitwise's increasing financial problems, Soberal and Olguin continued to conceal the company's true state. For example, in March 2023, Defendants represented to the company's Board that, as of December 31, 2022, the company had over $77 million of cash on hand.

47. Aware of Bitwise's actual cash shortages, Defendants continued to seek sources of money to fund the company. In early 2023, Bitwise, under the direction of Soberal, took out over $20 million in loans secured by real estate that purportedly belonged to Bitwise. In connection with these loans, Soberal provided the lender with documents appearing to show that Bitwise's Board had approved the transactions. Defendants forged the Board's signatures on these documents, and the Board was not informed about these loans.

48. On May 28, 2023, Defendants alerted Bitwise's Board about the company's financial distress and that it lacked the ability to make payroll. At an emergency meeting the following day, Defendants were unable to explain to the Board what had happened with the investor money Bitwise had raised, and, for the first time, disclosed that the company owed over $20 million in private loans.

49. On May 29, 2023, Soberal and Olguin held a video conference for Bitwise's entire workforce. On that video conference, they read a prepared statement informing Bitwise's personnel that they were all immediately furloughed and that their previously issued paychecks might bounce.

50. On June 3, 2023, the Bitwise Board announced that it had terminated Soberal and Olguin and that one of the Board members would serve as interim CEO.

51. On June 28, 2023, the Board filed a petition for Chapter 7 bankruptcy in the United State District Court for the District of Delaware on behalf of BWI, Bitwise Industries, and several related entities. These entities are all currently in liquidation proceedings.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

52. The Commission realleges and incorporates by reference paragraphs 1 through 51.

53. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

   a. Employed devices, schemes, or artifices to defraud;
   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

54. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act**

55. The Commission realleges and incorporates by reference paragraphs 1 through 51.

56. Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or

communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

57. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Permanently enjoin Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Permanently enjoin Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunctions shall not prevent Soberal or Olguin from purchasing or selling securities for their own personal accounts.

**III.**

Issue an order barring Defendants from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Issue an order requiring Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon.

**V.**

Issue an order requiring Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may deem just and necessary.

Dated:  November 9, 2023          Respectfully submitted,

  /s/ Drew Liming
Drew Liming
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION